UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF MISSISSIPPI

IN RE:

| | |
|---|---|
| LESTER W. PARISH AND<br>LESA E. PARISH, | CASE NO. 07-50365-NPO |
| | CHAPTER 13 |
| DEBTORS. | |

| | |
|---|---|
| JIM HERRING, DEBBIE HERRING,<br>AND EUGENE M. HARLOW | PLAINTIFFS |
| VS. | ADV. PROC. NO. 07-05025-NPO |
| LESTER W. PARISH AND<br>LESA E. PARISH | DEFENDANTS |

**MEMORANDUM OPINION
EXCEPTING DEBT FROM DISCHARGE
PURSUANT TO 11 U.S.C. § 523(a)(6)**

On November 4, 2009, the trial (the "Trial") commenced on the Amended Complaint to Determine Dischargeability of Debt Pursuant to 11 U.S.C. § 523 (the "Amended Complaint") (Adv. Dkt. No. 77) filed by Jim Herring and Debbie Herring (the "Herrings"), and Eugene M. Harlow ("Harlow") (collectively, the "Plaintiffs"), against the Debtors, Lester W. Parish and Lesa E. Parish (the "Parishes"), in the above-styled adversary proceeding (the "Adversary"). The Plaintiffs seek exception from discharge for judgments entered against the Parishes in the Circuit Court of the Second Judicial District of Jones County, Mississippi (the "Circuit Court"). At the Trial, Allen Flowers appeared on behalf of the Parishes, and Mr. Harlow appeared on behalf of the Herrings and himself. The Court, having considered the testimony and evidence presented at the Trial, finds that the relief requested in the Amended Complaint is well-taken and that the judgments owed to the

Plaintiffs should be excepted from discharge pursuant to 11 U.S.C. § 523(a)(6)[1] as follows[2].

## Jurisdiction

This Court has jurisdiction over the parties to and the subject matter of this proceeding pursuant to 28 U.S.C. §1334. This matter is a core proceeding as defined by 28 U.S.C. §157(b)(2)(I). Notice of the Trial was proper under the circumstances. (Adv. Dkt. No. 65).

## Facts

**1. Chancery Court Proceedings.**

In the spring of 2002, the Parishes had trees on their property logged. Trees, tree tops, and other debris were left in and across the ditch on the Parishes' property which runs through the adjacent Herring property. After problems with flooding on the Herrings' property were not remedied, the Herrings filed a suit for injunctive relief in the Chancery Court of the Second Judicial District of Jones County, Mississippi (the "Chancery Court") in May of 2002. After a court appearance in June of 2002, Chancery Judge Franklin McKenzie ("Chancery Judge") instructed the Parishes to clear the ditch. Apparently, the Parishes failed to comply with the instructions of the Chancery Judge.

**2. Circuit Court Proceedings.**

The Herrings filed an action in the Circuit Court on February 17, 2004. An amended complaint was later filed in the Circuit Court by Mr. Harlow, on behalf of the Herrings, against the Parishes requesting relief based upon claims of negligence, private nuisance, intentional infliction

---

[1] Hereinafter all code sections refer to the United States Bankruptcy Code located at title 11 of the United States Code unless otherwise noted.

[2] The following constitutes the findings of fact and conclusions of law of the Court pursuant to Federal Rule of Bankruptcy Procedure 7052.

of emotional distress, trespass, gross negligence, and negligence per se, and also requesting injunctive relief. (Plaintiffs' Trial Ex. No. 1). On January 11, 2007, an Amended Judgment (the "Amended Judgment") was signed by Billy Joe Landrum, Circuit Court Judge (the "Circuit Judge"), granting the Herrings the sum of $10,000.00 damages as awarded by a jury verdict (the "Jury Verdict") on September 21, 2006[3]; $7,236.45 for attorney's fees to Mr. Harlow pursuant to Miss. Code Ann. § 95-5-10, which provides for damages for cutting down trees without the consent of the owner; and $2,000.00 for attorney's fees to Mr. Harlow pursuant to MRCP, Rule 37(c) for the Parishes failure to admit certain requests for admissions. Interest was awarded at 8% per annum pursuant to Miss. Code Ann. § 75-17-7. (Plaintiffs' Trial Ex. No. 2).

Also on that date, the Circuit Judge signed an Amended Order (the "Amended Order") that contained the state court's factual findings and legal conclusions on the Herrings' requests for injunctive relief, and attorney's fees, noting that the trial of the matter had resulted in the Jury Verdict. (Plaintiffs' Trial Ex. No. 3). In the Amended Order, the Circuit Judge found that, "[i]n late 2001, the "[Herrings] began to have flooding of their property as a result of obstructions in the ditch on the property of [the Parishes] which is adjacent to and downstream from [the Herrings'] property." (Amended Order, ¶ 1). The Circuit Judge also found that the Herrings had continued to have flooding in 2006, and that the proof showed "flooding is certain to recur" without work on the ditch at the Parishes' property. He also noted that the Parishes had logging done on their property in 2002, and that trees and brush from the logging were placed into the ditch causing further

---

[3] Plaintiffs' Trial Ex. No. 32 included a breakdown of damages in the total amount of $11,980.00 that were presented to the jury showing actual damages of $300.00 for trees cut, $2,000.00 for ditch work, and $880.00 for replanting. Non-economic damages were listed in the amount of $8,800.00 representing 1760 days at $5 perday. The jury returned a $10,000.00 verdict without an itemization of the award.

obstruction of the flow of water from the Herrings' property.

The Circuit Judge held that, "[a]ccording to Mississippi law, [the Herrings] have the right to have the flow of surface water follow along a water course from their land and through the land of another. [The Herrings'] request for mandatory and prohibitory permanent injunction is hereby granted. [The Parishes] are hereby ordered to clean out their ditch . . . ." (Amended Order at 4). The Circuit Court Judge ordered that any obstructions placed in the ditch were to be immediately removed, and further gave the Parishes sixty (60) days to clean the ditch by scraping the sides of the ditch and maintaining the drop in elevation.

Additionally, the Circuit Judge found that subsequent to the logging, the Parishes encroached on the Herrings' property when they installed a new boundary line fence, including cutting trees and brush on the Herrings' property and leaving the debris along with the old barbed wire and fence posts. The Parishes were further ordered to move the fence back to the original location and to remove the debris.

### 3. Bankruptcy Proceedings.

#### a. Bankruptcy Case.

On March 23, 2007, approximately two months after the Amended Order and Amended Judgment were entered, the Parishes filed a voluntary chapter 13 petition in the United States Bankruptcy Court for the Southern District of Mississippi. (Case No. 07-50365-NPO (Dkt. No.1)). The Herrings were listed in the Parishes' Schedule D, Creditors Holding Secured Claims, as holding a "Judgment" dated January 12, 2007, in the amount of $19,236.00, with such claim shown as contingent, unliquidated, and disputed. (Dkt. No. 3). An order was entered on May 2, 2007, avoiding the judicial lien of the Herrings to the extent it impairs property of the Parishes that is

otherwise exempt. (Dkt. No. 21). On August 10, 2007, an order confirming the Parishes' sixty (60) month plan (the "Plan") was entered. (Dkt. No. 30). The Plan attached to the confirmation order listed the Herrings as special claimants with the proposal to "Cancel & Avoid." The Parishes' plan provided for a minimum payment of 10% on unsecured debts. (Dkt. No. 30). The chapter 13 trustee filed his Motion to Allow Claims ("Motion to Allow Claims") on September 5, 2007, with the summary attachment listing the Herrings for the amount of $1,053.10, and Mr. Harlow in the amount of $954.44 (Dkt. No. 32).[4] On October 11, 2007, an order was entered granting the Motion to Allow Claims. (Dkt. No. 38).

### b. Adversary.

#### i. Preliminary Matters.

On July 5, 2007, the Plaintiffs initiated the Adversary by the filing of a complaint (the "Complaint") against the Parishes. (Adv. Dkt. No. 1). The Plaintiffs request that an order be entered determining the indebtedness owed them by the Parishes to be nondischargeable pursuant to Section 523(a)(6), as a debt for "willful and malicious injury by the debtor to another entity or to the property of another entity." The Complaint references the Jury Verdict, with the Amended Judgment and Amended Order of the Circuit Judge attached as exhibits.

On October 28, 2009, an agreed order was entered allowing the Plaintiffs to amend the Complaint to include an averment of collateral estoppel. (Adv. Dkt. No. 79). The Amended Complaint was filed on October 28, 2009, and included collateral estoppel as to determinations previously litigated in the Circuit Court proceeding, including "sanctions in the form of attorney fees

---

[4] These amounts represent 10% of the total amount of claims shown on the proofs of claim filed by the Herrings and Mr. Harlow for unsecured nonpriority claims (Claims Register).

and findings of willful and malicious conduct." (Amended Complaint at 2). An Answer to the Amended Complaint also was filed on October 28, 2009. (Adv. Dkt. No. 78). On October 29, 2009, the Consolidated Pretrial Order (the "Pretrial Order") was entered. (Adv. Dkt. No. 80).

### ii. Trial.

At the Trial on the Amended Complaint, counsel for the parties initially made arguments to this Court on issues relating to collateral estoppel. The Court made preliminary rulings, noting that the Amended Order of the Circuit Judge had not been appealed and had become final. The Court held that it is bound by the *Rooker-Feldman* doctrine,[5] and that it will not litigate again what is a final judgment from a state court proceeding. However, the Court concluded that the standards upon which the state court jury and judge reached its findings, as to the wrongful cutting of trees and related actions and associated attorneys' fees, are not the identical standards as those under Section 523(a)(6) for a willful and malicious injury to another entity or to the property of another entity. Therefore, collateral estoppel cannot apply to preclude litigation of issues as they relate to the elements required for an action under Section 523(a)(6). In other words, state court proceedings do not preclude a bankruptcy court from making an independent determination as to the elements required for determining dischargeability under § 523(a)(6).[6] Collateral estoppel does apply,

---

[5] Under that doctrine, "[w]hen issues raised in a federal court are 'inextricably intertwined' with a state [court] judgment and the court is 'in essence being called upon to review the state-court decision,' the court lacks subject matter jurisdiction to conduct such a review." Davis v. Bayless, 70 F.3d 367, 375-376 (5th Cir. 1995) (citing United States v. Shepherd, 23 F.3d 923, 924 (5th Cir. 1994); District of Columbia Court of Appeals v. Feldman, 460 U.S. 462 (U.S. 1983); Rooker v. Fidelity Trust, 263 U.S. 413 (U.S. 1923)).

[6] *See* Caton v. Trudeau (In re Caton), 157 F.3d 1026, 1028 (5th Cir. 1998) (collateral estoppel applies in dischargeability proceedings but the bankruptcy court retains exclusive jurisdiction to determine whether a debt is dischargeable); Gupta v. Eastern Idaho Tumor Institute, Inc. (In re Gupta), 394 F.3d 347, 349-50 (5th Cir. 2004)(bankruptcy court may apply

however, to those matters actually litigated, the Jury Verdict, Amended Judgment, and Amended Order.

Testimony from the witnesses, collectively, provided the factual background of these proceedings that began when the Herrings purchased their property in 1991. Although there may have been an early issue regarding obstructions in the ditch caused by beavers, the initial landowner of the property adjacent to the Herrings' property maintained his part of the ditch that ran from the Herrings' property through the adjacent property, allowing water to flow through the ditch. When kept free of debris, the ditch adequately drained both the Herrings' property and the adjacent property. However, in late 2001, a flooding problem developed on the Herrings' property after the adjacent property became unoccupied. Jim Herring spoke with Lester Parish, who was in the process of purchasing the property, about the problem. Aware of the need to maintain the ditch to rectify the flooding problem and having assured Jim Herring they would do so, the Parishes purchased the property in January of 2002.

In the spring of 2002, the Parishes logged their property. Trees, tree tops, and other debris were left in and across the ditch. Because the flooding problem on the Herrings' property was not remedied, but in fact worsened, the Herrings filed the Chancery Court action. The Herrings testified at the Trial that even though the Chancery Judge instructed the Parishes to clean the ditch, they failed to do so.

At some point, Lester Parish placed no trespassing signs on his property and, according to his Trial testimony, the message was aimed at everybody. He added that the signs also were intended for

---

collateral estoppel to preclude relitigation of findings relevant to dischargeability, and ultimate determination of dischargeability is a federal question.)

Jim Herring, who was coming on the Parishes' property and making demands. Jim Herring testified that the posting of the no trespassing signs prevented him from entering the property to remove beaver dams or other obstructions when the Herrings' property flooded.

When questioned at Trial about removing and repositioning the fence that marked the boundary between the properties, Lester Parish justified his actions by saying his cows were getting out of the old fence which needed repairing. He admitted that he did not remove the debris from the work on the new fence, including trees, fence posts, and barbed wire, until after the Circuit Judge's Amended Order. Additionally, he acknowledged that they cut trees belonging to the Herrings in the process of erecting the new fence and that the new fence encroached onto the Herrings' property.

The Herrings and the Parishes were completely incapable of resolving their differences. Debbie Herring initially called Lester Parish's wife, Lesa Parish, to express her concerns about the flooding in the Herrings' yard. In particular, she discussed her concerns for her child's safety due to the increase in water snakes and mosquitoes resulting from the flooding. However, Lesa Parish told Debbie Herring she would need to talk to Lester Parish because there was nothing she could do about it. Debbie Herring then contacted Lester Parish about these concerns but to no avail.

Other limited efforts to resolve the problems associated with the ditch prior to the Amended Order apparently were unsuccessful. Debbie Herring's testimony added that Lester Parish replaced a culvert on his property but that it was too small to prevent the flooding. Debbie Herring contacted the county agent who trapped and relocated some beavers, but the beavers returned at some point.

Tensions between the Herrings and Parishes escalated. Jim Herring testified that Lesa Parish told him they would get "laughed out of court." Debbie Herring felt the Parishes became resentful toward the Herrings. She said Lester Parish had threatened to shoot the Herrings' dog if it chased his

horses again. When the Herrings found their dog shot and killed, Debbie Herring believed Lester Parish had followed through on his threat.

In summary, the ditch on the Parishes' property had been maintained for 10 years by the prior owner. As Jim Herring stated, both properties drained well so long as the ditch was kept clear of debris and beaver dams. When debris and beaver dams obstructed the ditch, flood water backed up to within approximately ten feet of the Herrings' deck according to Jim Herring. At one point, despite having a bulldozer and trackhoe on their property for two days, the Parishes did not clear obstructions from the ditch. In fact, as noted by Jim Herring, the Parishes had years to clear the ditch of all obstructions but refused to do so until the Circuit Court entered its Amended Order.

## Discussion

Section 523(a)(6) provides an exception from discharge in a chapter 13 case:

> (a) A discharge under section . . . 1328(b) of this title does not discharge an individual debtor from any debt . . . .
>
> (6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

Section 523(a)(6). A creditor seeking to deny a debtor the discharge of a debt pursuant to Section 523(a)(6) must prove by a preponderance of the evidence that the debt is not dischargeable. Grogan v. Garner, 498 U.S. 279, 284 n.11 (1991); RecoverEdge L.P. v. Pentecost, 44 F.3d 1284, 1292 (5th Cir. 1995).

The U.S. Supreme Court in Kawaauhau v. Geiger, 523 U.S. 57, 61 (1998) stated that "[t]he word 'willful' in (a)(6) modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional *injury,* not merely a deliberate or intentional *act* that leads to injury." The Kawaauhau Court further held that "debts arising from recklessly or negligently inflicted injuries do

not fall within the compass of § 523(a)(6)." Id. at 63.

The Fifth Circuit has interpreted Section 523(a)(6) on a number of occasions since Kawaauhau. In Miller v. J.D. Abrams Inc. (In re Miller), 156 F.3d 598, 606 (5th Cir.1998), the Fifth Circuit held that "an injury is 'willful and malicious' where there is either an objective substantial certainty of harm or a subjective motive to cause harm."  The Miller court in defining "malicious" rejected that it meant an act without just cause or excuse. Id. at 605-606.  Instead, it adopted the "implied malice standard" and defined "malicious" as an act done with the "actual intent to cause injury." Id. at 606. The court observed that this definition of "malicious" is synonymous with the definition of "willful." Id.  Thus, it found the "treatment of the phrase as a collective concept is sensible given the Supreme Court's emphasis on the fact that the word they modify is 'injury.'" Id.; *see also* Raspanti v. Keaty (In re Keaty), 397 F.3d 264, 270 (5th Cir. 2005).

Later, in Williams v. IBEW Local 520 (In re Williams), 337 F.3d 504, 509 (5th Cir. 2003), the Fifth Circuit found that the "test for willful and malicious injury under Section 523(a)(6), thus, is condensed into a single inquiry of whether there exists 'either an objective substantial certainty of harm or a subjective motive to cause harm' on the part of the debtor. [Kawaauhau v. Geiger, 523 U.S. 57, 61-62 (1998)]. S*ee also* Texas v. Walker, 142 F.3d 813, 823 (5th Cir.1998) (stating "for willfulness and malice to prevent discharge under Section 523(a)(6), the debtor must have intended the actual injury that resulted. . . . Intent to injure may be established by showing that the debtor intentionally took action that necessarily caused, or was substantially certain to cause, the injury.")(citing In re Delaney, 97 F.3d 800, 802 (5th Cir.1996))."

The Court must, therefore, determine whether the Parishes acted with an objective substantial certainty to cause harm, or with a subjective motive to cause harm, to the Herrings or to their

property. The evidence presented to this Court, which includes much of the record of the state court proceedings in Circuit Court, shows that the Parishes were aware, prior to the purchase of the subject property in January of 2002, that the ditch which ran through their property needed to be maintained to prevent flooding on the Herrings' property. Also prior to their purchase of the property, Lester Parish indicated to Jim Herring that he would take care of the problem. Subsequent to the purchase, in the spring of 2002, the Parishes logged their property and left trees and debris in the ditch, exacerbating the problem. After the Herrings filed an injunction proceeding, the Chancery Judge instructed the Parishes to clean out the ditch, but they refused to comply. Subsequent to that time, the Parishes encroached upon the Herrings' property, removing portions of the boundary fence line and replacing it with new fencing, wrongfully cutting trees of the Herrings, and leaving debris and the old barbed wire fencing.

Throughout this time, the Parishes were aware that the Herrings were having problems with standing water, snakes being driven close to their house from the woods, and mosquitos at a time West Nile virus was threatening. The Parishes placed no trespassing signs on their property, further preventing the Herrings from making their own attempts to clear the ditch from obstructions caused by persistent beavers building dams. The ongoing feud resulted in strained relations between the parties that escalated. Finally, over five years after the Parishes purchased their property with notice of the need to maintain the ditch, the Herrings were awarded the Jury Verdict, and the Circuit Judge ordered the Parishes to clear the obstructions in the ditch. The ditch was cleared within sixty (60) days of the Amended Order and Amended Judgment.

The evidence presented, along with the findings from the Circuit Judge, show that failure to maintain the ditch and to keep it clear from obstructions would be certain to result in flooding of the

Herrings' property. Certainly, from an objective standpoint, there was a substantial certainty that the Herrings would be harmed by flooding on their property and all the attendant damages and nuisances from flooding, if the ditch was not kept clear from debris and maintained in a manner that would allow water to drain.

Furthermore, the facts of this case establish a subjective motive on the part of the Parishes to harm the Herrings or their property.[7] The Parishes knew of and witnessed the severity of the problem, had been instructed by a judge to fix the problem and had not done so, and continually delayed over a period of years when there was an ability and responsibility as a property owner to maintain the ditch and prevent obstructions so that water would drain from the adjoining property owned by the Herrings. The speed with which the ditch was ultimately cleared in itself demonstrates that it could have been done years earlier and the injury would have been avoided. Moreover, the more the Herrings pressured the Parishes and used litigation to resolve their differences, the more the Parishes responded with acts of spite.

The Herrings have met their burden of proof and have established the requirements necessary under Section 523(a)(6) for the debt to be excepted from discharge.[8] The Court is persuaded by the preponderance of the evidence that the debt based upon the Jury Verdict and the Circuit Judge's associated awards for attorneys' fees and sanctions should be excepted from discharge. *See* Barrett v. Barrett (In re Barrett), 410 B.R. 113, 124 (Bankr. S.D. Fla. 2009) (when a debt is nondischargeable

---

[7] At Trial, Lester Parish denied the essential elements of the § 523(a)(6) claim. The Court, however, did not find that testimony credible.

[8] *Cf*. Pharr v. Ford (In re Ford), 276 B.R. 561, 567 (Bankr. N.D. Miss. 2001) (debtor may have been negligent or even reckless in not monitoring cutting of timber and ascertaining location of property lines but did not act with actual intent to cause injury to the plaintiffs).

pursuant to § 523(a) attorney's fees and costs associated with that debt are likewise nondischargeable); Nolan v. Smith (In re Smith), 321 B.R. 542, 548 (Bankr. D. Colo. 2005) (language of judgment made it clear that attorney's fees and costs awarded by state court were awarded with respect to or by reason of the underlying conduct giving rise to the litigation and were nondischargeable). Specifically, the debts arising from the Jury Verdict, the Amended Judgment and the Amended Order are nondischargeable pursuant to Section 523(a)(6).

A separate final judgment consistent with this Memorandum Opinion will be entered by this Court in accordance with Federal Rules of Bankruptcy Procedure 7054 and 9021.